**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMAL SHARIF f/k/a DONALD NOBLES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15 C 10795 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| ARTHUR FUNK, M.D., SALEH OBAISI, | ) | |
| M.D., ALMA MARTIJA, M.D., and | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

In 2012, Plaintiff Jamal Sharif f/k/a Donald Nobles, an inmate at Stateville Correctional

Center ("Stateville"), began experiencing, among other things, difficulties with urination. The

following year, in June 2013, Stateville's Medical Director at the time, Dr. Saleh Obaisi,

diagnosed Sharif as having an enlarged prostate gland. Dr. Obaisi and Dr. Alma Martija

thereafter treated Sharif's prostate-related complaints on-site until June 2016, when Dr. Obaisi

referred Sharif to a urologist at the University of Illinois at Chicago ("UIC"). Sharif saw the

urologist in December 2016. A procedure recommended by the urologist identified an

obstruction of Sharif's prostatic urethra, and Dr. Obaisi referred Sharif to have a prostate biopsy

taken. The biopsy, taken in March 2017, revealed prostate cancer. After undergoing radiation

and other treatment, Sharif's cancer went into remission, and he was "cancer-free" as of

November 2019. Doc. 147 at 5.

Sharif alleges in this lawsuit that Dr. Obaisi, Dr. Martija, and Dr. Arthur Funk were

deliberately indifferent to his health in violation of 42 U.S.C. § 1983 (Count I), that Wexford

Health Sources, Inc. ("Wexford"), the company that employs or employed the doctors,

maintained a policy or custom of deliberate indifference that infringed on prisoners' constitutional rights (Count II), and that he is entitled to certain injunctive relief from Dr. Obaisi and Wexford (Count III). Dr. Funk, Dr. Martija, and Wexford ("Defendants") now seek summary judgment on Sharif's deliberate indifference claims, as well as his request for punitive damages in connection with these claims.

The Court grants in part and denies in part Defendants' summary judgment motion. Because Dr. Obaisi died in December 2017 and Sharif did not seek to substitute his estate as a party to this litigation, the Court dismisses Sharif's claim against Dr. Obaisi with prejudice under Federal Rule of Civil Procedure 25(a)(1). The Court grants summary judgment for Dr. Funk and Wexford: Sharif has not shown that a reasonable jury could find that Dr. Funk knew that Sharif was receiving inadequate treatment that required his intervention or that Wexford maintains an unconstitutional policy or custom of delaying or refusing necessary medical referrals to save costs. Because Sharif has not shown that a jury could find that punitive damages are warranted, the Court also grants summary judgment in Dr. Martija's favor on Sharif's request for punitive damages. But questions of fact exist as to whether Dr. Martija's treatment of Sharif demonstrates deliberate indifference, so Sharif's claim against Dr. Martija (excluding his request for punitive damages) must proceed to trial. Finally, because Sharif has achieved the end goal of the injunctive relief he sought—a determination of whether he has prostate cancer—the Court dismisses Sharif's claim for injunctive relief as moot.

## BACKGROUND[1]

### I.      Factual Background

Sharif is a 64-year-old African American inmate housed at Stateville.  He has been incarcerated within the Illinois Department of Corrections ("IDOC") since 1978 and within Stateville since 2008.  Wexford is a private corporation that contracts with IDOC to provide certain medical treatment to IDOC inmates, including Stateville inmates.  Dr. Funk has served as Wexford's Regional Medical Director for the northern half of Illinois, which includes Stateville, since 2005.  *Alvarez v. Wexford Health Sources, Inc.*, No. 13 C 703, 2016 WL 7046617, at *1 (N.D. Ill. Dec. 5, 2016).  Dr. Obaisi "served as Stateville's Medical Director from August 2012 until his death in December 2017."  *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 957 (7th Cir. 2019).  Dr. Martija was formerly a staff physician at Stateville.  Wexford employed both Dr. Obaisi and Dr. Martija, and it still employs Dr. Funk.  *Id.*; Doc. 145 at 2–3.

Because this case involves Sharif's treatment for prostate-related complaints and symptoms that doctors diagnosed as benign prostatic hyperplasia ("BPH"), prostatitis, and prostate cancer, the Court begins by briefly discussing these conditions.  BPH is also known as

---

[1] Unless otherwise noted, the Court derives the facts in the background section from the Joint Statement of Undisputed Material Facts; Sharif's Statement of Additional Facts; Defendants' Response to this Statement; the evidence cited by the parties as support for their factual statements, including Sharif's deposition testimony; the exhibits attached to Sharif's operative complaint; and this lawsuit's docket.  The Court takes all facts in the light most favorable to Sharif, the non-movant.

Even so, the Court notes that neither Sharif nor Defendants complied with the applicable summary judgment procedures.  Sharif violated the Court's summary judgment procedures by including undisputed facts in his separate statement of additional facts.  *See* Judge Sara L. Ellis, Case Procedures, Summary Judgment Practice, https://www.ilnd.uscourts.gov/judge-info.aspx?VyU/OurKKJRDT+FUM5tZmA==.  Defendants, for their part, improperly responded to many straightforward additional facts with argumentative answers that were not confined to the fact at issue and that obscured which aspects, if any, of the asserted fact are genuinely in dispute.  Responses of this type do nothing to help the Court "focus on the facts that are actually in dispute."  *See Sweatt v. Union Pac. R.R. Co.*, 796 F.3d 701, 711 (7th Cir. 2015); *see also Boyd v. City of Chicago*, 225 F. Supp. 3d 708, 716 (N.D. Ill. 2016) ("argumentative and immaterial assertions" in response to statements of fact did not comply with Local Rule 56.1).  Although the Court has overlooked these violations for purposes of Defendants' motion, it expects that the parties will fully comply with the Court's procedures and the Local Rules going forward.

enlargement of the prostate gland, which is a gland beneath a man's bladder through which the urethra (the tube that transports urine from the bladder out of the penis) passes. *Benign prostatic hyperplasia (BPH) – Symptoms and causes*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/benign-prostatic-hyperplasia/symptoms-causes/syc-20370087 (last visited, as were all websites cited in this opinion, on May 27, 2020) (hereinafter, "*BPH Symptoms and Causes*"). "Most men have continued prostate growth throughout life," and this continued growth can enlarge the prostate to the point that it causes uncomfortable urinary symptoms, such as "[i]ncreased frequency of urination at night," an "[i]nability to completely empty the bladder," and, less commonly, blood in the urine. *Id.* Prostatitis "is swelling and inflammation of the prostate gland." *Prostatitis – Symptoms and causes*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/prostatitis/symptoms-causes/syc-20355766 (hereinafter, "*Prostatitis Symptoms and Causes*"). Prostatitis can cause frequent urination at night, blood in the urine, pain or burning sensation when urinating, and abdominal and testicular pain. *Id.* Prostate cancer, as its name suggests, "is cancer that occurs in the prostate." *Prostate cancer – Symptoms and causes*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/prostate-cancer/symptoms-causes/syc-20353087 (hereinafter, "*Prostate Cancer Symptoms and Causes*"). African American males face a greater risk of prostate cancer than men of other races. *See id.*; Doc. 153 at 1. Symptoms of prostate cancer may include frequent urination at night, trouble emptying the bladder completely, blood in the urine, and pain or burning while urinating. *Prostate Cancer Treatment (PDQ ®) – Patient Version*, Nat'l Cancer Inst., https://www.cancer.gov/types/prostate/patient/prostate-treatment-pdq#_102 (hereinafter, "*Prostate Cancer Treatment*"). However, non-cancerous conditions, like BPH and prostatitis, can also cause the same or similar symptoms. *See id.*; *BPH Symptoms and Causes*; *Prostatitis*

*Symptoms and Causes*.  And while BPH and prostatitis can produce symptoms similar to those of prostate cancer, there is no evidence that either condition causes prostate cancer.  *See BPH Symptoms and Causes* ("Having an enlarged prostate is not believed to increase your risk of developing prostate cancer."); *Prostatitis Symptoms and Causes* ("There's no direct evidence that prostatitis can lead to prostate cancer.").

In 2012, Sharif began experiencing the need to frequently urinate at night, an inability to empty his bladder, testicular and stomach pain, blood in his urine and stool, and general pain and discomfort.  On March 7, 2012, Sharif underwent lab work that showed his prostate-specific antigen ("PSA") level to be 3.9 ng/mL.[2]  As set forth in the corresponding lab report, the "Reference Range" for PSA levels is 0.0–3.9, and someone circled and drew an arrow to Sharif's PSA reading.  Doc. 149 at 8.  Less than a week later, Sharif presented to Stateville physician Dr. Dubrick complaining of urinary symptoms, including urinary frequency.  Dr. Dubrick reported Sharif's PSA level to be 3.9, which he noted was "borderline" and should be reviewed again in three months.  *Id.* at 2.  Dr. Dubrick further noted that if, at that time, Sharif's PSA was still elevated and Sharif was symptomatic, he "may need consideration [illegible] VS."[3]  *Id.*  Dr. Dubrick recommended that Sharif allow a digital (finger) rectal examination ("DRE") of his

---

[2] "PSA is a protein produced by both cancerous and noncancerous tissue in the prostate."  *PSA test*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/psa-test/about/pac-20384731 (hereinafter, "*PSA Test*").  A higher than normal level of PSA in the blood "may indicate prostate infection, inflammation, enlargement or cancer."  *Prostate cancer – Diagnosis and treatment*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/prostate-cancer/diagnosis-treatment/drc-20353093 (hereinafter, "*Prostate Cancer Diagnosis and Treatment*").

[3] The parties dispute whether this aspect of Dr. Dubrick's note says that Sharif may need an outside consultation if he is still symptomatic and showing elevated PSA levels after three months.

5

prostate "to check for cancer or enlargement."[4]  *Id.* at 23.  But Sharif refused to consent to a DRE because of "religious reasons."  *Id.* at 2, 23.  In April, Sharif's PSA level was 4.7.

During a visit to the Cardiac Chronic Clinic on July 6, 2012, Sharif expressed no complaints about his prostate or his ability to urinate.  Although Sharif presented for urine testing the same day, the record does not reflect Sharif's PSA level at that time.[5]  By November, though, Sharif's PSA level had climbed to 5.2.  The November 2012 lab report indicated that this level was "Out of Range," and someone drew an arrow to Sharif's PSA reading.  Doc. 149 at 11.  Six months later, in May 2013, Sharif's PSA level was 5.0.  The May 2013 lab report likewise indicated that Sharif's PSA level was out of range, and someone circled and drew an arrow to this reading as well.

Sharif first saw Dr. Obaisi on June 27, 2013.  Dr. Obaisi noted Sharif's prior PSA testing and his complaints of nocturia (frequent urination at night) "for several months, lately worse, small amounts each time."  Doc. 149 at 3.  Dr. Obaisi's assessment was BPH, i.e., an enlarged prostate gland.  Sharif requested to see a urologist, and on or around July 8, Dr. Obaisi discussed whether to refer Sharif to a UIC urologist with Dr. Garcia, a utilization management physician, as part of a collegial peer review.[6]  Drs. Obaisi and Garcia concluded that Sharif should be

---

[4] A DRE examines the prostate, which is adjacent to the rectum, by inserting a gloved, lubricated finger into an individual's rectum.  *Prostate Cancer Diagnosis and Treatment*.

[5] As an additional statement of fact, Sharif submits that in May 2012, he "filed a grievance alleging that his PSA results were being withheld because he had refused" to undergo a DRE, and that the response to the grievance stated that the results of blood tests and urinalysis ordered on July 12 were within the normal range.  Doc. 153 at 4.  Defendants deny this alleged fact.  The Court cannot evaluate the accuracy of Sharif's contention or the genuineness of the alleged dispute because neither Sharif nor Defendants provided the document (WEX 000109) upon which they base the alleged fact and denial.

[6] Typically, when a Stateville doctor requested that an inmate be referred to an outside provider for consultation, the request "had to go through a collegial peer review process, which Wexford called 'Utilization Management.'"  *Walker*, 940 F.3d at 957.  After this collegial review, which could involve consultations with several medical professionals or simply one other doctor, Wexford would approve or deny the referral request.  *See id.*; *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 660 (7th Cir.

treated on-site at Stateville and that a urologist's intervention was not required at the time. On July 25, a Stateville medical professional prescribed Sharif finasteride to address his prostate complaints, but this prescription was replaced less than a week later with a prescription for 0.4 mg of tamsulosin (brand name Flomax) to be taken daily for six months.[7]

In August 2013, Sharif was referred to UIC's orthopedic clinic for treatment on his right ankle and knee. At a September visit with a Stateville staff nurse, Sharif reported having all-night painful erections while on the prostate medication, but at a medical visit in November, Sharif did not report any complaints, and the nurse who saw Sharif did not note any distress. The nurse ordered Sharif to return to the clinic for continued monitoring.

In early December 2013, Sharif's PSA level was 5.0. Someone circled and drew an arrow to this reading, which was out of range. Later that month, Sharif complained to a nurse about side effects from his prostate medication. He also reported that the prostate medication was not helping—he was urinating every 30 minutes and could not completely empty his bladder. Sharif requested to be prescribed either Super Beta Prostate or Prosvent, which are supplements that he became aware of from watching infomercials. The nurse referred Sharif to general medicine for his prostate issues and made a note to "req. Beta prostate." Doc. 145-4 at

---

2016) (addressing a Wexford collegial committee review consisting of the referring doctor and one other physician); *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 787 (7th Cir. 2014) (same); *see also Whiting*, 839 F.3d at 665 (Wood, C.J., concurring in part and dissenting in part) (characterizing Wexford's "review committee" as "a simple process through which one doctor consults with a second and allows the second to override his recommendation").

[7] Finasteride is used to treat symptoms of BPH. *Finasteride (Oral Route) Description and Brand Names*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/finasteride-oral-route/description/drg-20063819. It works by decreasing the size of the prostate, which, in turn, improves the BPH symptoms. *Id.* Tamsulosin is also used to treat symptoms of BPH, but it does so by helping "relax the muscles in the prostate and the opening of the bladder," which "may help increase the flow of urine and decrease the symptoms" of BPH. *Tamsulosin (Oral Route) Description and Brand Names*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/tamsulosin-oral-route/description/drg-20068275. Unlike finasteride, tamsulosin does not shrink the prostate. *Id.*

19. The Stateville physicians did not allow Sharif to take Super Beta Prostate or Prosvent, however, because they were not approved by the FDA.

From January through September 2014, Sharif saw medical personnel, including Dr. Obaisi, on several occasions for knee pain, elbow pain, leg swelling, sinus issues, dry skin, and headaches, and during this time frame, Dr. Obaisi referred Sharif to UIC for consultation regarding his right knee pain.[8] The records do not indicate that Sharif complained about prostate issues at any of these visits. In an October 10 health status transfer summary, a nurse noted that Sharif did not have any current acute conditions or problems and did not identify prostate or urinary issues as a chronic condition or problem.

Nonetheless, on September 14, 2014, Sharif filed a grievance requesting to see a prostate cancer specialist as soon as possible. He asserted that he had to urinate nine to twelve times every night and that his current prostate medication (0.4 mg of Flomax) was not helping him at all. An affidavit signed by Sharif's cellmate two days later corroborated Sharif's urinary complaints. The IDOC counselor who responded to the grievance, however, noted that when Sharif saw a nurse on September 16, he did not mention this issue. The counselor instructed Sharif to "put in a sick call slip and ask to see a doctor to be re-evaluated." Doc. 23-1 at 3. The reviewing grievance officer, chief administrative officer, and administrative review board concurred with the counselor's response.

Dr. Martija first examined Sharif on October 21, 2014. During the examination, Sharif complained about frequent urination, a burning sensation while urinating, and testicular pain. He also requested to be examined by an outside urologist or oncologist. Dr. Martija denied this request and, according to Sharif, was only concerned with his high blood pressure and increasing

---

[8] Sharif saw a doctor at UIC for his right knee pain in February 2015. He later underwent an MRI, as recommended by the UIC doctor, and also underwent right knee surgery at UIC in March 2016.

the dosages of his current medications. Dr. Martija instructed Sharif to take 2 mg of terazosin (brand name Hytrin) nightly at bedtime.[9] Dr. Martija deferred evaluating Sharif's prostate by way of a DRE, noting that he was in a jumpsuit and handcuffs. She scheduled Sharif to undergo a DRE in the emergency room in December, which appears to have been performed by Dr. Obaisi on December 18. During his December 18 examination of Sharif in the emergency room, Dr. Obaisi informed Sharif that he had been scheduled to see an off-site specialist for his ongoing right-knee pain and possible surgery. However, when Sharif requested a specialist for his frequent urination issues, Dr. Obaisi told Sharif that he looked all right and that they would discuss it later.

In January 2015, Sharif complained to a nurse that terazosin made him dizzy and caused headaches. The nurse referred Sharif to Dr. Martija to re-evaluate his need for prostate medications. Sharif saw Dr. Martija two weeks later, on January 22. At this visit, Dr. Martija took Sharif off all medications and refused to provide any medication for his prostate problems. A week later, on January 29, Sharif filed a grievance regarding his medical treatment. In his grievance, Sharif requested to be seen by a prostate specialist or, alternatively, to be given "innovative medication" to treat his prostate illness or improve the quality of his health. Doc. 23-1 at 7. Sharif asserted that he noticed blood in his urine that day and experienced a painful burning sensation in his penis that lasted the entire day. He also reported experiencing frequent urination the previous two nights. Sharif claimed that he had previously brought this issue to Dr.

---

[9] Terazosin is used to treat both high blood pressure and prostate gland enlargement. *Terazosin (Oral Route) Description and Brand Names*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/terazosin-oral-route/description/drg-20066315. With respect to prostate gland enlargement, "[t]erazosin helps relax the muscles in the prostate and the opening of the bladder," which "may help increase the flow of urine and/or decrease" urinary symptoms. *Id.* It is unclear whether Dr. Martija prescribed the terazosin to address Sharif's high blood pressure, his prostate issues, or both. The Court notes that Stateville physicians had prescribed Sharif, and then discontinued, terazosin on at least one previous occasion.

Obaisi's attention but that his treatment was not working. It does not appear that IDOC took any action on Sharif's grievance; rather, the IDOC Administrative Review Board returned the grievance to Sharif because it required additional information.

On January 30, 2015, Sharif complained to a nurse about blood in his urine and a burning sensation in his penis. He also asserted that he had been without prostate medication for months and that the medication he had been given was not helping with his urination frequency. The nurse told him that one of his blood pressure medications causes frequent urination and said that she would schedule Sharif to see the doctor. The same day, Sharif wrote a letter to Dr. Louis Shicker, IDOC's Agency Medical Director. Sharif requested to be examined by a prostate specialist and noted his frequent urination, blood in urine, and burning sensation. He further asserted that because no medication had yet cured his symptoms, the doctors had taken him off all medications.

On February 9, 2015, Sharif requested a PSA test while having blood lab work performed, but the nurse informed him that inmates were no longer provided their PSA results. Upon further inquiry, Sharif came to believe that, per Dr. Funk's orders, inmates had stopped receiving their PSA results about a year before, and that the only way for inmates to obtain their PSA results was to request them from Dr. Funk or Dr. Obaisi. The next day, February 10, Dr. Martija examined Sharif and reviewed his blood lab work. When Sharif asked for his PSA results, Dr. Martija said that "we no longer receive that information" and that Sharif would have to talk to Dr. Obaisi about it. Doc. 23-1 at 16. Sharif brought up his issues with frequent nightly urination and showed Dr. Martija the rings around his eyes from loss of sleep, but Dr. Martija stated that "it wasn't too bad." *Id.* Dr. Martija prescribed Sharif, among other things, 500 mg of

10

Tylenol to take twice daily as needed, but she did not prescribe Sharif any medication for his prostate issues.

Sometime thereafter, Sharif sent a letter to Dr. Funk.[10]  Sharif asserted that he needed to know his PSA results to avoid prostate cancer and that his last DRE was performed by Dr. Obaisi.  Sharif also asserted that he was not currently taking any medication and that his previous medications were ineffective; specifically, his Flomax prescription did not stop his frequent nightly urination, and the Hytrin prescribed by Dr. Martija caused severe headaches and double vision.  Sharif requested that "Adovart" (the Court presumes Sharif meant Avodart)[11] be added to his Flomax prescription.  Doc. 23-1 at 14.  Sharif also asked Dr. Funk to allow him to take Super Beta Prostate and/or Prosvent to address his frequent urination and loss of sleep that he had been enduring for years.  Dr. Funk did not respond to this letter, and there is no evidence that he received the letter.

On February 19, 2015, Dr. Shicker responded to Sharif's January 30 correspondence regarding his complaints "about urinary frequency preventing any meaningful sleep."  Doc. 23-1 at 12.  Dr. Shicker's letter, which copied Drs. Obaisi and Funk, stated that Dr. Obaisi would be addressing the matter in the near future.  Dr. Obaisi saw Sharif two weeks later, on March 5.  Sharif described his problems—nightly urination, blood in urine, and burning sensation while

---

[10] Sharif's letter to Dr. Funk is undated.  But the letter refers to a recent examination by Dr. Martija where Sharif's blood lab results did not show his PSA levels, which is presumably Dr. Martija's February 10, 2015 examination.  Doc. 23-1 at 14–15.  Sharif also asserts in the letter that he was not taking any prostate medications, which was no longer the case once Dr. Obaisi prescribed him Flomax again on March 5.  These endpoints suggest that Sharif sent the letter to Dr. Funk sometime between February 10 and March 5, 2015.

[11] Avodart is the brand name for dutasteride, which can be used alone or in combination with Flomax "to treat men who have symptoms of an enlarged prostate gland."  *Dutasteride (Oral Route) Description and Brand Names*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/dutasteride-oral-route/description/drg-20063575.

urinating—and Dr. Obaisi assessed Sharif as experiencing prostatitis.  Dr. Obaisi renewed Sharif's Flomax prescription for one year.

Dr. Martija saw Sharif again on March 24, 2015.  During the examination, Dr. Martija briefly mentioned Sharif's filing of grievances and complaints against her co-workers. According to Sharif, she also did not like Dr. Obaisi's Flomax prescription, and she discussed changing it to Hytrin.  However, when Sharif refused to take Hytrin (it had caused headaches and dizziness in the past), Dr. Martija "kicked [Sharif] out [of] her office."  Doc. 23-1 at 19.  In an affidavit Sharif signed that day, he also asserted that Dr. Martija had, for several months, "denied all medication for frequent nightly urination."  *Id.*

On May 5, 2015, Sharif reported to Dr. Martija that he had stopped taking one of his blood pressure medications (HCTZ) because it caused increased frequent urination, and Dr. Martija discontinued Sharif's HCTZ prescription.  Sharif saw Dr. Martija again on May 20, complaining of prostate issues, e.g., urinary frequency and pain in his right testicle.  Dr. Martija noted Sharif's Flomax prescription and prescribed him 500 mg of levofloxacin to be taken daily for ten days.[12]  Dr. Martija deferred any genital examination to Dr. Obaisi and instructed Sharif to follow up in one week with Dr. Obaisi regarding his testicular pain.[13]

From June through November 2015, Sharif saw Dr. Martija several times for issues unrelated to his prostate, including hypertension, shortness of breath, headaches, insomnia, and suspected pneumonia and/or bronchitis.  Over the same period of time, Sharif saw Dr. Obaisi regarding his knee, ankle, and headaches caused by his blood pressure medication.  Sharif did

---

[12] Levofloxacin is an antibiotic "used to treat bacterial infections in many different parts of the body." *Levofloxacin (Oral Route) Description and Brand Names*, Mayo Clinic, https://www.mayoclinic.org/drugs-supplements/levofloxacin-oral-route/description/drg-20064518.  The parties agree that levofloxacin is used to treat prostatitis and urinary infections.

[13] The parties have not provided any evidence that this follow-up appointment took place.

12

not raise any issues with his prostate to either doctor during this time period. Even so, Sharif's cellmate claimed in July that Sharif was experiencing "extreme issues concerning urination." Doc. 23-1 at 32. On November 16, when Dr. Martija saw Sharif for his semi-annual medical check-up, she diagnosed him with prostate issues but noted that Sharif's BPH was improving. Dr. Martija instructed Sharif to continue taking 0.8 mg of Flomax daily.[14] This was the last time Dr. Martija treated Sharif for his prostate issues; she thereafter saw Sharif only once more, when he presented to the asthma clinic in early January 2016. Meanwhile, Dr. Obaisi continued to be involved with Sharif's care, although this care was largely focused on Sharif's knee in late 2015 through early 2016. For instance, Dr. Obaisi noted in December 2015 that Sharif was approved for right-knee surgery at UIC, and after Sharif underwent this surgery in March 2016, Dr. Obaisi referred Sharif to physical therapy.

However, in late April 2016, Sharif could not produce urine when he presented for a residual urine test. And at his annual medical examination on May 2, Sharif reported urinating nine to eleven times per night and difficulty emptying his bladder. The examination notes indicate that Sharif reported that he had experienced these difficulties for more than two years and that they had never improved with any medications. The examining medical professional ordered Sharif to continue taking his medications (0.8 mg of Flomax daily) as directed and referred him to the medical director (Dr. Obaisi) for re-evaluation of his BPH and medications. On June 29, Dr. Obaisi requested a referral for Sharif to see a urologist at UIC to evaluate his problems with urinary frequency, noting that Sharif had experienced these problems for two to

---

[14] It is unclear when doctors first increased Sharif's Flomax dosage to 0.8 mg. A health status transfer summary authored six days before Dr. Martija's November 16 examination indicates that Sharif was taking only 0.4 mg of Flomax at that time, but Dr. Martija's examination record lists 0.8 mg as Sharif's current dosage.

13

three years with no response to antibiotics or Flomax. After a collegial review with another doctor, Wexford approved Dr. Obaisi's request a little more than a week later.

Per Dr. Obaisi's referral request, Sharif saw a urologist at UIC in December 2016. The urologist summarized Sharif's symptoms as gross hematuria (blood in the urine) and lower urinary tract symptoms "with possible BPH vs stricture." Doc. 149 at 30. The urologist ordered a PSA test, which showed a PSA level of 6.1. The urologist recommended that Sharif continue to take tamsulosin (Flomax) for his BPH and begin taking finasteride daily; that Sharif have a CT scan taken of his abdomen and pelvis; and that Sharif return to the clinic to undergo a cystoscopy.[15] Dr. Obaisi and Wexford followed the urologist's recommendations: Sharif was prescribed finasteride, he had a CT scan performed in December 2016, and he underwent a cystoscopy procedure in February 2017. The December 2016 CT scan showed an enlarged prostate, and the February 2017 cystoscopy identified an obstruction of the prostatic urethra. Dr. Obaisi requested (and Wexford approved) a referral for a uro-oncology evaluation at UIC. The same day as the cystoscopy, Dr. Obaisi also requested that Sharif have a prostate biopsy taken at UIC. Wexford approved this request as well. The biopsy, taken on March 15, 2017, unfortunately revealed prostate cancer.

Sharif elected to undergo radiation therapy to treat his prostate cancer, which Dr. Obaisi approved. After consulting with a radiation oncologist, Sharif began radiology treatment at UIC in July 2017. Wexford sent Sharif off-site to UIC five days per week for radiation treatment over five to six weeks; in total, Sharif received approximately 28 radiation treatments. During his radiation treatment, Sharif continued to take Flomax (0.8 mg) and finasteride. Many of Sharif's

---

[15] A cystoscopy is a procedure whereby a doctor examines the lining of an individual's bladder and the urethra by inserting a hollow tube (cystoscope) equipped with a lens into the urethra and slowly advancing the tube into the bladder. *Cystoscopy*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/cystoscopy/about/pac-20393694.

urinary symptoms went away during and after radiation treatment, and as of May 2, 2019 (when Defendants deposed Sharif), Sharif's prostate cancer was in remission, although he also testified that some symptoms had returned and he had begun experiencing frequent urination again. In his November 19, 2019 summary judgment response, however, Sharif claimed to be "cancer-free." Doc. 147 at 5.

## II.    Procedural Background

Sharif filed this lawsuit *pro se* in November 2015. The Court recruited counsel for Sharif, who filed the operative second amended complaint on June 17, 2016. On July 7, Sharif moved for a preliminary injunction that would require Wexford and Drs. Obaisi, Martija, and Funk to promptly refer and transport him to a specialist and provide any treatment prescribed by that specialist. The Court denied the motion without prejudice a week later.

On March 16, 2018, Wexford filed a suggestion of death for Dr. Obaisi. According to the suggestion of death, Dr. Obaisi died on December 23, 2017, and an independent executor had been appointed for his estate. The suggestion of death also specified how a party could serve the executor with a motion to substitute the estate as a litigant. Sharif has not moved to substitute Dr. Obaisi's estate as a party to this litigation.

After several extensions, fact discovery closed on August 16, 2019. On October 18, Dr. Martija, Dr. Funk, and Wexford moved for summary judgment. Sharif, represented by recruited counsel, opposes the motion.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the

15

pleadings and assess the proof as presented in depositions, documents, answers to

interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record.

Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992).

The party seeking summary judgment bears the initial burden of demonstrating that no genuine

dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed.*

*Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-

moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above

to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P.

56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627

(7th Cir. 2014). Although a bare contention that an issue of fact exists does not create a factual

dispute, *N. Assurance Co. of Am. v. Summers*, 17 F.3d 956, 961 (7th Cir. 1994), the Court must

construe all facts in the light most favorable to the non-moving party and draw all reasonable

inferences in that party's favor, *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013).

"To defeat summary judgment, a party must present a 'genuine dispute' of material fact such that

a reasonable jury could find in its favor." *PMT Mach. Sales, Inc. v. Yama Seiki USA, Inc.*, 941

F.3d 325, 328 (7th Cir. 2019) (citations omitted).

## ANALYSIS

### I.     Dr. Obaisi's Status as a Party

Dr. Obaisi did not join Defendants' motion for summary judgment because he died on

December 23, 2017. On March 16, 2018, Wexford filed a suggestion of death notifying the

Court and the parties of Dr. Obaisi's death. More than two years later, Sharif still has not moved

to substitute Dr. Obaisi's estate as a party in this litigation. The Court must therefore determine,

as a threshold matter, if and how Dr. Obaisi's death during the pendency of this litigation affects

Sharif's ability to proceed with his deliberate indifference claim against Dr. Obaisi. *See Atkins v. City of Chicago*, 547 F.3d 869, 872 (7th Cir. 2008) (deceased individual "ceased, upon his death, to be a party" to the litigation); *see also LN Mgmt., LLC v. JPMorgan Chase Bank, N.A.*, 957 F.3d 943, 951 (9th Cir. 2020) ("[T]he consensus of our sister courts is unanimous: you cannot sue a dead person.").

Under Federal Rule of Civil Procedure 25(a)(1), an action against a deceased party must be dismissed if a motion to substitute another party for the decedent "is not made within 90 days after service of a statement noting the death." Defendants argue that because Sharif has not timely sought to substitute Dr. Obaisi's estate as a party to this litigation, Dr. Obaisi was dismissed as a party on June 16, 2018 (90 days after Wexford's filing of the suggestion of death) "by automatic operation of Rule 25." Doc. 144 at 3. But Rule 25(a)(1) does not say that the action *is* dismissed after the passage of 90 days without the filing of a motion for substitution, which would indicate automatic dismissal by operation of the rule. Rule 25(a)(1) states that an action *must be* dismissed, which indicates that a party or the court must take action to dismiss the deceased party. Furthermore, a court may grant motions for substitution that are filed after the 90-day window closes if the moving party demonstrates "excusable neglect" pursuant to Rule 6(b). Fed. R. Civ. P. 6(b)(1)(B); *Atkins*, 547 F.3d at 871–72; *Cont'l Bank, N.A. v. Meyer*, 10 F.3d 1293, 1295, 1297 (7th Cir. 1993) (affirming district court's grant of a motion for substitution filed more than eight months after the suggestion of death). A court's discretion to do so would be illusory if Rule 25 automatically dismissed a party after the passage of 90 days.

That said, the Court agrees that Dr. Obaisi should no longer be a party to this case. Wexford notified Sharif of Dr. Obaisi's death in March 2018. Even if this notification somehow

fell through the cracks,[16] Defendants expressly called out the suggestion of death and Rule 25(a)(1) in their October 2019 summary judgment briefing. Yet, several months later, Sharif still has not sought to substitute Dr. Obaisi's estate as a party in this litigation, let alone explain why his failure to do so earlier should be excused under Rule 6(b). Accordingly, the Court dismisses Sharif's claim against Dr. Obaisi with prejudice under Rule 25(a)(1). *See Russell v. City of Milwaukee*, 338 F.3d 662, 663, 667–68 (7th Cir. 2003) (affirming district court's dismissal of a case with prejudice under Rule 25(a) where a motion for substitution was untimely filed and the movant did not make "any showing or argument of excusable neglect"); *Klein v. Wexford Health Sources, Inc.*, No. 16 C 8818, 2019 WL 2435850, at *1, *6 (N.D. Ill. June 11, 2019) (dismissing § 1983 claim against Dr. Obaisi under Rule 25(a)(1) where the plaintiff did not file a motion for substitution).

## II.    Deliberate Indifference Claim Against Dr. Martija and Dr. Funk (Count I)

Given Dr. Obaisi's dismissal under Rule 25(a)(1), the Court need only address Sharif's deliberate indifference claim with respect to Dr. Martija and Dr. Funk. Health care providers violate the Eighth Amendment when they act with deliberate indifference to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011). Deliberate indifference has both objective and subjective elements: (1) the inmate must have an objectively serious medical condition, and (2) the defendant must be subjectively aware of and disregard a substantial risk of harm to the inmate's health. *Goodloe v. Sood*, 947 F.3d 1026, 1030–31 (7th Cir. 2020); *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc).

---

[16] When Wexford filed the suggestion of Dr. Obaisi's death, the Court was in the process of recruiting counsel to represent Sharif. Sharif's current recruited counsel did not appear in this case until June 27, 2018, more than three months after Wexford filed the suggestion of death.

### A.   Objective Element of Deliberate Indifference

An objectively serious medical condition is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (citation omitted).  Here, a reasonable jury could find that Sharif's BPH and prostatitis were objectively serious medical conditions.[17]  These conditions caused Sharif to frequently urinate at night, have trouble emptying his bladder, experience blood in his urine, and suffer testicular pain, and doctors diagnosed both conditions and attempted to treat their symptoms.  *See id.*; *see also Brown v. Obaisi*, 16 CV 10422, 2018 WL 4467098, at *7 (N.D. Ill. Sept. 18, 2018) (finding that BPH was an objectively serious medical condition).  Moreover, Defendants do not dispute that Sharif suffered from one or more objectively serious medical conditions.  Thus, the Court turns its analysis to the subjective element of Sharif's deliberate indifference claim.

### B.   Subjective Element of Deliberate Indifference

The subjective element of a deliberate indifference claim has two components: the defendant (1) must actually know about a substantial risk of harm to an inmate; and (2) disregard that risk.  *Petties*, 836 F.3d at 728; *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).  This requires the defendant to act with a sufficiently "culpable state of mind, something akin to criminal recklessness."  *Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006).  Negligence does

---

[17] Sharif's prostate cancer may also qualify as an objectively serious medical condition, but he does not assert a deliberate indifference claim based on the treatment of this condition.  The operative complaint, which Sharif filed before he was diagnosed with prostate cancer in March 2017, alleged deliberate indifference to his prostatitis, *see, e.g.*, Doc. 23 ¶¶ 47, 57, and Sharif did not seek to amend his complaint to assert a deliberate indifference claim based on his cancer treatment.  What is more, Sharif "admits [that] his treatment has been 'totally adequate' since he found out he had prostate cancer."  Doc. 145 at 16 (Undisputed Material Fact No. 93).  In fact, there is no indication that Sharif takes issue with any of the treatment he has received since July 2016, when Wexford approved Dr. Obaisi's request to refer Sharif to an off-site urologist.  *See* Doc. 147 at 5 (assertion by Sharif that after Wexford approved his urology consult on July 7, 2016, his "diagnosis of, and treatment for, prostate cancer proceeded relatively quickly").

not satisfy this standard, nor does objective recklessness, i.e., "failing to act in the face of an

unjustifiably high risk that is so obvious that it *should* be known." *Petties*, 836 F.3d at 728

(emphasis in original).

Although a mistake in professional judgment alone does not constitute deliberate

indifference, evidence that a defendant "knew better than to make the medical decision[s]" that

he or she made is enough to survive summary judgment. *Whiting v. Wexford Health Sources,*

*Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016) (citation omitted). Evidence sufficient to create a jury

question as to a medical professional's state of mind might include

> the obviousness of the risk from a particular course of treatment,
> the defendant's persistence in a course of treatment known to be
> ineffective, or proof that the defendant's treatment decision
> departed so radically from accepted professional judgment,
> practice, or standards that a jury may reasonably infer that the
> decision was not based on professional judgment.

*Id.* at 663 (citations omitted) (internal quotation marks omitted).

With these standards in mind, the Court considers Sharif's deliberate indifference claim

against Dr. Martija and Dr. Funk.

### 1.      Dr. Martija

Dr. Martija treated Sharif for his prostate-related complaints from October 2014 through

November 2015. By the time Dr. Martija first saw Sharif for these complaints, Sharif had been

complaining about urinary issues since March 2012. Sharif had also been taking 0.4 mg of

Flomax daily since July 2013, which he started taking shortly after Dr. Obaisi diagnosed him

with BPH.

The following summarizes Dr. Martija's treatment of Sharif's prostate-related complaints

in chronological order:

- On October 21, 2014, Sharif complained to Dr. Martija about frequent urination, a burning sensation while urinating, and testicular pain. He also requested to be examined by an outside urologist or oncologist. Dr. Martija denied this request and, according to Sharif, was only concerned with his high blood pressure and increasing the dosages of his current medications. Dr. Martija instructed Sharif to take 2 mg of terazosin (a medication used to treat both high blood pressure and prostate gland enlargement) nightly at bedtime. She deferred evaluating Sharif's prostate by way of a DRE because he was in a jumpsuit and handcuffs. Instead, Dr. Martija scheduled Sharif to undergo a DRE in the emergency room in December, and it appears that Dr. Obaisi performed a DRE on December 18.

- After Sharif complained to a nurse about side effects from taking terazosin (headaches and dizziness), the nurse referred him to Dr. Martija for re-evaluation of his prostate medications. At the subsequent January 22, 2015 visit, Dr. Martija took Sharif off all medications and refused to provide any medication for his prostate problems.

- On February 10, 2015, Dr. Martija reviewed Sharif's blood lab work with him. When Sharif asked for his PSA results, Dr. Martija told him that they no longer received that information and that he would have to talk to Dr. Obaisi about it. Sharif also brought up his issues with frequent nightly urination and showed Dr. Martija the rings around his eyes from loss of sleep; Dr. Martija responded that "it wasn't too bad." Doc. 23-1 at 16. Dr. Martija prescribed

Sharif 500 mg of Tylenol to take twice daily as needed, but she again did not prescribe Sharif any medication for his prostate issues.

- On March 24, 2015, Dr. Martija saw Sharif again. At this visit, Dr. Martija mentioned Sharif's filing of grievances and complaints against her co-workers. Dr. Martija also discussed changing Dr. Obaisi's March 5 Flomax prescription to Hytrin, but when Sharif refused to take Hytrin because it had caused headaches and dizziness in the past, Dr. Martija "kicked [Sharif] out [of] her office." Doc. 23-1 at 19. The same day, Sharif signed an affidavit claiming that Dr. Martija had, for several months, "denied all medication for frequent nightly urination." *Id.*

- On May 5, 2015, Dr. Martija discontinued one of Sharif's blood pressure medications, HCTZ, after he reported that it caused increased frequent urination.

- On May 20, 2015, Sharif presented to Dr. Martija complaining of urinary frequency and pain in his right testicle. Dr. Martija noted Sharif's Flomax prescription and prescribed him 500 mg of an antibiotic (levofloxacin) to be taken daily for ten days. Dr. Martija deferred any genital examination to Dr. Obaisi and instructed Sharif to follow up in one week with Dr. Obaisi regarding his testicular pain, but there is no evidence in the record that this follow-up examination took place.

- On November 16, 2015, Dr. Martija saw Sharif for his semi-annual check-up examination. Dr. Martija noted Sharif's prostate issues but recorded that his

BPH was improving. She instructed Sharif to continue taking 0.8 mg of

Flomax daily.

As can be seen, Dr. Martija's course of treatment consisted primarily of prescribing or

discontinuing medications. She did not examine Sharif's prostate or genitals, although she did

schedule or instruct Sharif to see other doctors for these examinations, and it appears that Sharif

did in fact undergo a DRE in December 2014. Dr. Martija also did not refer Sharif to a

specialist.

Viewing this evidence in the light most favorable to Sharif, a reasonable jury could

conclude that Dr. Martija exhibited deliberate indifference to Sharif's BPH and prostatitis.

When Sharif presented to Dr. Martija in January 2015 for re-evaluation of his prostate

medications because terazosin (Hytrin) was causing headaches and dizziness, Dr. Martija did not

seek to substitute another medication or treatment. She simply discontinued *all* of Sharif's

medications, which, at that time, included Flomax. At Sharif's next visit, Dr. Martija again did

not prescribe any prostate medications (she prescribed Tylenol, but there is no indication that this

was for Sharif's prostate issues) and opined that Sharif's loss of sleep "wasn't too bad." Doc.

23-1 at 16. It was not until March 5, roughly six weeks after Dr. Martija discontinued Sharif's

medications, that Sharif again began taking medications to treat his prostate issues, and that was

when Dr. Obaisi (not Dr. Martija) renewed Sharif's Flomax prescription. Then, during Sharif's

March 24 visit, Dr. Martija mentioned Sharif's filing of grievances and complaints against her

co-workers. And when Sharif refused to take Hytrin instead of Flomax as Dr. Martija suggested

because of Hytrin's side effects, Dr. Martija did not change Sharif's Flomax prescription to

another medication, add to this prescription, or suggest an alternative course of treatment; she

kicked Sharif out of her office.

This timeline shows that despite knowing about Sharif's urinary symptoms, Dr. Martija did not prescribe any medication to treat these symptoms for six weeks. A jury could reasonably conclude that Dr. Martija's failure to prescribe *any* type of medication or other treatment to alleviate Sharif's symptoms for several weeks, without any apparent justification, was "so plainly appropriate as to permit the inference that [Dr. Martija] intentionally or recklessly disregarded [Sharif's] needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008); *see also Richter v. Wexford Health Sources, Inc.*, No. 14 C 6480, 2017 WL 2813658, at *5 (N.D. Ill. June 29, 2017) ("Denying medication to an inmate without cause may violate the Eighth Amendment."). For instance, in *Arnett v. Webster*, 658 F.3d 742 (7th Cir. 2011), the Seventh Circuit found that an inmate stated a deliberate indifference claim against medical defendants who, like Dr. Martija here, knew about the inmate's painful condition yet failed to provide him with any medication to address it. *Id.* at 752. Given that a jury can find deliberate indifference when physicians proceed with a knowingly ineffective course of treatment, *Goodloe*, 947 F.3d at 1031, a jury can find deliberate indifference when a physician inexplicably proceeds with no course of treatment.

This is especially the case where the physician's lack of treatment is accompanied by other actions that a jury could find inappropriate. *See Gil v. Reed*, 381 F.3d 649, 661–62 (7th Cir. 2004) (genuine factual dispute as to a physician assistant's state of mind existed because a jury could infer from the assistant's "angry and unexplained refusal" to give an inmate his prescribed medication that the refusal was malicious); *Wilder v. Wexford Health Sources, Inc.*, No. 11 C 4109, 2015 WL 2208440, at *9 (N.D. Ill. May 8, 2015) ("A medical professional's . . . response to pain complaints that is plainly inappropriate[] permit the inference of deliberate indifference."). A jury could conclude that there was no medically legitimate reason for Dr.

24

Martija to mention Sharif's prior complaints and grievances or for her to dismiss Sharif when he refused to take a medication that had previously caused dizziness and headaches. Instead, a jury could view these actions as indicative of animosity towards Sharif based on his prior complaints or his refusal to accede to Dr. Martija's desired treatment, which "may show deliberate indifference." *Taylor v. Garcia*, No. 11 C 7386, 2015 WL 5895388, at *6 (N.D. Ill. Oct. 6, 2015).

A reasonable jury could also find that Dr. Martija exhibited deliberate indifference by failing to refer Sharif to a specialist at least by the time she last treated him in November 2015. Although the decision to not consult a specialist will support "a claim of deliberate indifference only if that choice is 'blatantly inappropriate,'" *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (citation omitted), "if the need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person, then the 'obdurate refusal' to engage specialists permits an inference that a medical provider was deliberately indifferent to the inmate's condition." *Id.* at 412 (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)). Dr. Obaisi recognized the potential need to consult a urologist in July 2013 but decided to instead try on-site treatment. After several months of this treatment (e.g., taking Flomax), however, Sharif was still experiencing urinary symptoms when he first saw Dr. Martija more than a year later, in October 2014. Dr. Martija's first prescribed medication (Hytrin) did not work either; it caused headaches and dizziness. Then, despite taking Flomax again for two months, Sharif presented to Dr. Martija in May 2015 complaining of urinary frequency and testicular pain. Dr. Martija prescribed an antibiotic and ordered a genital exam, but Sharif presented again six months later still complaining about prostate issues. It was only after Sharif saw a urologist in December

2016 (per Dr. Obaisi's June 2016 referral) that he began receiving treatment that effectively addressed what was ultimately determined to be prostate cancer.

In sum, by November 2015, Sharif had been undergoing on-site treatment for more than two years after Dr. Obaisi first floated the idea of a urology consultation without significant (if any) progress. A jury could find that this lack of progress called for a specialist's opinion. *See Greeno*, 414 F.3d at 655 (refusal to refer an inmate to a specialist or authorize an endoscopy over a two-year period could support a finding of deliberate indifference); *cf. Goodloe*, 947 F.3d at 1031 (persisting with a course of treatment known to be ineffective can constitute deliberate indifference). Moreover, the fact that Sharif only began receiving effective treatment once he saw the urologist suggests that his doctors should have made the referral much earlier. *See Greeno*, 414 F.3d at 655 ("The fact that the endoscopy, when finally performed, did lead to successful treatment makes it all the more obvious that Dr. Daley and the other medical staff should have responded earlier to Greeno's requests for further testing."). The Court concludes that a reasonable jury could find that the need for Sharif to see a specialist "would have been obvious to a lay person" at least by the time Dr. Martija last saw Sharif in November 2015. *See Pyles*, 771 F.3d at 412.

In arguing that Dr. Martija did not act with the required culpability, Defendants claim that there is no verifying medical evidence demonstrating the inadequacy of Dr. Martija's treatment. This is true enough, but such evidence is not essential if a medical decision was so obviously wrong that a jury could draw the required inference about the physician's state of mind without that evidence.[18] *See Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 520 (7th Cir. 2019)

---

[18] As Defendants point out, when an inmate claims that "prison officials delayed rather than denied medical assistance," verifying medical evidence is essential to show "that the delay (rather than the inmate's underlying condition) caused some degree of harm." *Williams v. Liefer*, 491 F.3d 710, 714–15

("[A] medical expert is not always essential for an Eighth Amendment deliberate indifference claim based on medical treatment (or lack thereof)[.]"); *Whiting*, 839 F.3d at 663 (implicitly recognizing that a medical decision can be "so obviously wrong that a layperson could draw the required inference about the doctor's state of mind without expert testimony"); *Petties*, 836 F.3d at 729 ("If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it."). Here, even without independent medical or expert evidence, a jury could conclude that the need to send Sharif to a specialist after two-plus years of ineffective treatment was obvious and that discontinuing prostate medication without substituting any other treatment would obviously do nothing to alleviate Sharif's urinary symptoms. *See Whiting*, 839 F.3d at 663 ("State-of-mind evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment [or] the defendant's persistence in 'a course of treatment known to be ineffective.'" (citations omitted)). Especially in light of her actions at the March 24 visit, a reasonable jury could therefore conclude that Dr. Martija made her medical decisions with knowing disregard for Sharif's prostate-related issues.

Defendants also contend that the totality of care rendered by Dr. Martija, including her treatment of complaints unrelated to Sharif's prostate, shows that she was not deliberately indifferent to Sharif's medical needs. A court must "look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728. But even considering the totality of Dr. Martija's care and treatment, the Court believes that a reasonable jury could find her deliberately indifferent for the reasons already discussed. The Court does not see how the care rendered by Dr. Martija for

---

(7th Cir. 2007). But the Court does not view Sharif's deliberate indifference claim against Dr. Martija as being based on a delay in treatment, so the absence of verifying medical evidence is not fatal to the claim.

Sharif's other ailments undermines the potential conclusion that Sharif, after years of apparently ineffective treatment for his prostate issues, needed to see a specialist for these issues. In addition, otherwise adequate care does not necessarily prevent a jury from inferring culpability based on Dr. Martija's failure to provide *any* prostate medication for six weeks or her dismissal of Sharif from her office in March 2015 in a manner that could be viewed as reflecting animus. *See Gil*, 381 F.3d at 662 (a physician assistant's single "deliberate and potentially malicious act" was enough to survive summary judgment on the issue of the assistant's state of mind); *Dunigan ex rel. Nyman v. Winnebago Cty.*, 165 F.3d 587, 591 (7th Cir. 1999) ("Mistreatment for a short time might in some circumstances be evidence of a culpable state of mind."); *Holton v. Hamblin*, No. 11-CV-246-SLC, 2013 WL 6525881, at *2 (W.D. Wis. Dec. 12, 2013) (finding that a jury could reasonably conclude that a doctor's failure to treat an inmate's complaints of pain during any of three separate six-month periods constituted deliberate indifference, "even though he was not deliberately indifferent to plaintiff's other medical conditions").

At the same time, not all of Sharif's contentions on summary judgment are persuasive either. Although Sharif complains about Dr. Martija's failure to perform a DRE, she scheduled Sharif to have a DRE performed, and it appears that Dr. Obaisi did in fact perform a DRE in December 2014. As for Sharif's contention that Dr. Martija should have checked his PSA levels, the decision to order a PSA test or not is "a classic example of a matter for medical judgment." *See Pyles*, 771 F.3d at 411 (citation omitted). This type of decision leads to liability only if it is "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." *Id.* at 409, 411 (citation omitted). But there is no evidence that Dr. Martija deviated from any professional

standards of care by not ordering a PSA test.[19]  To the contrary, "[t]here is a lot of conflicting advice about PSA testing," and "[p]rofessional organizations vary in their recommendations about who should—and who shouldn't—get a PSA screening test."  *PSA Test*.

Sharif also suggests that his July 7, 2016 preliminary injunction motion triggered the treatment that led to his cancer diagnosis, and that his need to file such a motion "is a pretty good sign that he had *not* previously been receiving constitutionally adequate care."  Doc. 147 at 7 (emphasis added).  This contention ignores the fact that Dr. Obaisi requested a referral for Sharif to see an off-site urologist on June 29, more than a week before Sharif filed his motion.  It also incorrectly assumes that the mere fact that an inmate requests (via lawsuit or motion) a particular type of treatment demonstrates that the inmate's previous or current treatment was constitutionally inadequate.  *See Grund v. Murphy*, 736 F. App'x 601, 604 (7th Cir. 2018) (a prisoner "has no right to her preferred course of treatment"), *cert. denied*, 139 S. Ct. 1560 (2019).

Nonetheless, there is sufficient evidence in the record upon which a reasonable jury could rely to find that Dr. Martija "knew better than to make the medical decision[s]" that she made. *Whiting*, 839 F.3d at 662–63 (citation omitted).  Therefore, Sharif's deliberate indifference claim against Dr. Martija must proceed to trial.  Because Sharif's claim against Dr. Martija remains in the case, the Court must also address Defendants' additional argument that Sharif has not shown that he is entitled to punitive damages even if his deliberate indifference claim survives summary judgment.  A jury may assess punitive damages for a § 1983 claim "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous

---

[19] According to Sharif's February 10, 2015 affidavit, Dr. Martija stated at an examination the same day that "we no longer receive" PSA results and that Sharif would have to speak with Dr. Obaisi to obtain his PSA results.  Doc. 23-1 at 16.  These statements could suggest that Dr. Martija was prohibited from ordering a PSA test and reviewing its results, or they could suggest that Dr. Martija was permitted to do so but was not allowed to disclose the results of the test to an inmate.  The record is unclear on this point.

indifference to the federally protected rights of others." *Green v. Howser*, 942 F.3d 772, 781 (7th Cir. 2019) (citation omitted). Defendants contend that punitive damages are not warranted because it is evident from the record that they "never intended to cause [Sharif] any harm; [] instead, they only intended and desired to secure the best possible medical outcome for [Sharif], and they complied with all applicable community medical standards of care for treating" Sharif. Doc. 144 at 14–15. Sharif does not respond to this argument, thereby conceding the point. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

The Court therefore grants summary judgment in Dr. Martija's favor on Sharif's request for punitive damages but otherwise denies summary judgment as to Sharif's deliberate indifference claim against Dr. Martija.

### 2. Dr. Funk

Dr. Funk, Wexford's Regional Medical Director for the northern half of Illinois, did not treat Sharif. Rather, as set forth in the parties' statement of undisputed material facts:

> Plaintiff is suing Dr. Arthur Funk due to his supervisory position at Wexford, because Plaintiff sent him a letter, and Dr. Funk is "perhaps" responsible for Plaintiff not being sent offsite earlier. He also claims a "nurse Jennie" told him Dr. Funk put a hold on showing patients their PSA results, and he would have to talk to [Dr.] Funk to receive it. Plaintiff has never spoken to Dr. Arthur Funk. Plaintiff claims he sent Dr. Funk a letter, but does not have evidence it was ever received.

Doc. 145 at 16–17 (Undisputed Material Fact No. 97). This is the only statement of fact (out of 129 statements of fact submitted by Sharif either as an additional fact or jointly with Defendants as an undisputed fact) regarding Dr. Funk's actions in this case.

In their summary judgment motion, Defendants argued that "Dr. Funk is entitled to summary judgment because he had no personal participation in [Sharif's] medical care" and

30

because the letter Sharif claimed to have sent to him is an insufficient basis for liability under
§ 1983. Doc. 144 at 4–6. Sharif's opposition did not respond to these arguments; in fact, it did
not even mention Dr. Funk by name. *See Bonte*, 624 F.3d at 466 ("Failure to respond to an
argument . . . results in waiver."). Summary judgment was the time for Sharif to demonstrate
why a jury could find that Dr. Funk was deliberately indifferent to his medical needs. *See Siegel
v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("Summary judgment is the 'put up or shut
up' moment in a lawsuit." (citation omitted)); *Caisse Nationale de Credit Agricole v. CBI Indus.,
Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) ("A party seeking to defeat a motion for summary
judgment is required to 'wheel out all its artillery to defeat it.'" (citation omitted)). Sharif's
failure to do so runs counter to a finding that this claim should go to a jury.

But even if the Court considers Sharif's single statement of fact regarding Dr. Funk
supposed liability, summary judgment is proper in Dr. Funk's favor. At the outset, many aspects
of this statement clearly do not warrant a jury trial on Sharif's claim against Dr. Funk, and the
Court can dispose of them in short order. First, Dr. Funk's supervisory position alone does not
subject him to § 1983 liability: "Section 1983 'does not allow actions against individuals merely
for their supervisory role of others.' To be liable, a supervisor 'must know about the conduct
and facilitate it, approve it, condone it, or turn a blind eye.'" *Doe v. Purdue Univ.*, 928 F.3d 652,
664 (7th Cir. 2019) (citations omitted). Second, Sharif's assertion that "Dr. Funk is 'perhaps'
responsible for [him] not being sent offsite earlier," Doc. 145 at 16, is mere speculation, which
"is not enough to create a genuine issue of fact for the purposes of summary judgment."
*Consolino v. Towne*, 872 F.3d 825, 830 (7th Cir. 2017). Third, Sharif's claim that Dr. Funk was
responsible for not allowing inmates to see their PSA results is supported only by (1) an alleged
statement by "nurse Jennie" and (2) Sharif's assertion in a February 9, 2015 affidavit that he

31

learned this upon further inquiry. Nurse Jennie's statement is an out-of-court statement that the Court does not consider for its truth because Sharif has not shown that it is admissible as non-hearsay or under a hearsay exception. *See* Fed. R. Evid. 801(c)–(d), 802; *Hildreth v. Butler*, --- F.3d ----, 2020 WL 2536620, at *6–7 (7th Cir. May 19, 2020) (district court did not err in excluding nurses' statements on summary judgment where inmate did not establish that the statements were non-hearsay); *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (courts may not consider inadmissible hearsay on summary judgment). The Court also does not consider Sharif's assertion that he learned that Dr. Funk was responsible for the withheld PSA results because the underlying affidavit, Doc. 23-1 at 13, fails to provide a sufficient evidentiary foundation for this assertion. *See* Fed. R. Civ. P. 56(c)(4) (requiring affidavits on summary judgment to be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated"). In any event, even if Dr. Funk had prohibited inmates from seeing their PSA results, Sharif makes no attempt to explain why this constitutes deliberate indifference. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("[A] party waives an argument by failing to make it before the district court.").

That leaves the letter Sharif claims to have sent to Dr. Funk. The record contains an undated letter from Sharif to Dr. Funk that, if sent, was likely sent between February 10 and March 5, 2015.[20] In this letter, Sharif informed Dr. Funk that he had been enduring problems with frequent urination and corresponding sleep loss for years. He asserted that he was no longer taking any medications and that his previous medications were ineffective—Flomax did not stop

---

[20] The record also contains a letter sent by IDOC's Agency Medical Director, Dr. Shicker, on February 19, 2015 to Sharif, with a copy to Dr. Funk and others. Dr. Shicker's letter referred to Sharif's complaints "about urinary frequency preventing any meaningful sleep" and told Sharif that Dr. Obaisi would address the matter "in the near future." Doc. 23-1 at 12. Neither Sharif nor Defendants relied upon this letter in their summary judgment briefing, so the Court does not say anything more about it.

his frequent nightly urination, and the Hytrin prescribed by Dr. Martija caused severe headaches and double vision. Sharif requested that Avodart be added to his Flomax prescription and that he be allowed to take Super Beta Prostate and/or Prosvent, which are two supplements not approved by the FDA. He also requested to see his PSA levels.

There is no evidence that Dr. Funk received or reviewed Sharif's letter. At the same time, even though Defendants have been aware of this letter since the beginning of the case (Sharif attached it to both his *pro se* complaint and the operative complaint), they do not provide any evidence suggesting that Dr. Funk did *not* receive or review this letter. Thus, there is at least a question as to whether Dr. Funk received and reviewed Sharif's letter, and the Court proceeds on the basis that a jury could find that Dr. Funk did so. *See Patterson v. Wexford Health Sources*, 13 C 1501, 2016 WL 723018, at *7 (N.D. Ill. Feb. 22, 2016) (finding that the existence of letters from the plaintiff, which the defendants disputed receiving, created a genuine issue of fact as to whether the defendants were aware of the plaintiff's belief that he was not receiving proper medical care); *Taylor*, 2015 WL 5895388, at *4 ("Sending letters to a prison official, even without proof of receipt, can create a triable issue of fact as to knowledge depending on their content and manner of transmission.").

The question therefore becomes whether a reasonable jury could find Dr. Funk liable under § 1983 based on Sharif's letter. Despite an official's lack of personal involvement with an inmate's treatment, the "official's knowledge of prison conditions learned from an inmate's communications can, under some circumstances, constitute sufficient knowledge of the conditions to require the officer to exercise his or her authority and to take the needed action to investigate and, if necessary, to rectify the offending condition." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). The plaintiff bears "the burden of demonstrating that the communication, in

33

its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety'" and that the official then approved the constitutional deprivation, "turned a blind eye to it, failed to remedy it, or in some way personally participated." *Id.* at 993–94 (citation omitted). In other words, there must be "some causal connection or affirmative link between the action complained about and the official sued" for § 1983 liability to attach. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

Here, much of Sharif's letter merely reflects his opinion about the best way to treat his prostate issues and avoid prostate cancer, i.e., by knowing his PSA levels and being prescribed certain medications (Avodart plus Flomax and Super Beta Prostate and/or Prosvent). Sharif, however, had "no right to [his] preferred course of treatment," *Grund*, 736 F. App'x at 604, and his disagreement with his course of treatment did not raise a red flag as to the adequacy of his treatment, *see Sharif v. Ghosh*, No. 12 C 2309, 2013 WL 228239, at *5 (N.D. Ill. Jan. 18, 2013) (finding that a letter written by Sharif to Wexford's CEO "indicate[d] only a difference of opinion between the doctors and [Sharif] as to his condition and how best to treat it" and was insufficient to support a deliberate indifference claim against the officer); *see also Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) ("There is not one 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field."). Nor has Sharif explained how any other aspect of this letter could lead a reasonable jury to find that Dr. Funk was alerted to constitutionally inadequate treatment.

In the end, Sharif has not identified a question of fact as to whether his letter sufficiently informed Dr. Funk of an inadequate treatment situation that required his intervention. *See Vance*, 97 F.3d at 993–94. Thus, the Court grants summary judgment for Dr. Funk on Sharif's deliberate indifference claim against him.

34

### III. *Monell* Claim against Wexford (Count II)

Sharif also contends that Wexford is liable to him "because it maintains an unconstitutional policy and adopts a custom of deliberate indifference to the known or obvious consequences of its practices."  Doc. 23 ¶ 60.  Specifically, Sharif alleges that Wexford, "in the interest of cost-cutting," has a policy of refusing to refer prisoners to specialists for consultation and that this policy included "intentionally not providing a urologist for Mr. Sharif to perform a biopsy and check for prostate cancer."  *Id.* ¶¶ 9, 63.

A private company like Wexford may be held liable under § 1983 for deliberate indifference pursuant to *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978).  *See Whiting*, 839 F.3d at 664 ("[T]he *Monell* theory of municipal liability applies in § 1983 claims brought against private companies that act under color of state law.").  To prove a *Monell* claim against Wexford, Sharif must show that Wexford "maintained an unconstitutional policy or custom" that caused "the injury that is the basis of [his] § 1983 claim."  *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1035 (7th Cir. 2019) (citation omitted).

Defendants argue that Sharif's *Monell* claim fails because he has no evidence of an unconstitutional policy or custom of delaying or deferring necessary medical referrals to save costs.  Sharif does not respond to this argument, essentially conceding the issue, *see Bonte*, 624 F.3d at 466, and he more explicitly concedes that he "does not know of any specific [Wexford] policies" to support his claim against Wexford.  Doc. 145 at 17 (Undisputed Material Fact No. 99).  Indeed, Sharif does not identify any evidence upon which a reasonable jury could rely to find that Wexford had a policy or custom of refusing to refer prisoners to specialists or delaying such referrals as a cost-saving measure.  To the contrary, the evidence shows Wexford's willingness to refer Sharif to specialists for his other medical issues; he saw off-site specialists

multiple times between 2013 and 2016 regarding his right knee and, in March 2016, he underwent right knee surgery at UIC. The Court grants summary judgment for Wexford on Sharif's *Monell* claim.

## IV.    Injunctive Relief (Count III)

Finally, the Court addresses Sharif's claim for injunctive relief. "A court's power to grant injunctive relief only survives if such relief is actually needed." *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009), *abrogated on other grounds by Jones v. Carter*, 915 F.3d 1147, 1149– 50 (7th Cir. 2019). In the operative complaint, Sharif asks the Court to direct Dr. Obaisi and Wexford to arrange for him "to see a urologist immediately, to release his PSA levels, and to perform a biopsy to determine whether he has prostate cancer." Doc. 23 ¶ 70. But Sharif has already achieved the end goal of the injunctive relief he sought—a determination of whether he has prostate cancer—and this determination was made after Sharif saw a urologist and underwent a biopsy, as he requested. Sharif's claim for injunctive relief is therefore moot. *Bey v. Haines*, 802 F. App'x 194, 200 (7th Cir. 2020) (finding that the district court properly dismissed as moot an inmate's request to force his prison "to keep a full-time dentist on staff to reduce long wait times" where the Department of Corrections had hired a full-time and a part- time dentist, which reduced wait times); *Pakovich v. Verizon LTD Plan*, 653 F.3d 488, 492 (7th Cir. 2011) (finding that the plaintiff's benefit claim became moot when she "received everything she requested" in the claim). The Court dismisses Sharif's request for injunctive relief on that basis. *See Pakovich*, 653 F.3d at 492 ("Federal courts lack subject matter jurisdiction when a case becomes moot."); *see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) ("[C]ourts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."); *Thompson v. Bukowski*, --- F. App'x ----, 2020

WL 2097278, at *2 (7th Cir. May 1, 2020) ("[M]ootness is a jurisdictional issue that cannot be passed over.").

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion for summary judgment [143]. The Court dismisses Dr. Obaisi as a party from this lawsuit with prejudice under Federal Rule of Civil Procedure 25(a)(1). The Court also dismisses Sharif's claim for injunctive relief as moot. The Court enters judgment for Dr. Funk and Wexford. Sharif's deliberate indifference claim against Dr. Martija remains in the case, but Sharif cannot pursue punitive damages against her. The Court sets a status date for July 29, 2020 at 9:30 a.m.

Dated: June 30, 2020

_____
SARA L. ELLIS
United States District Judge